## Benjamin S. Compton v. James Blair.

*Novation: Abandonment: New arrangement: Promissory note: Consideration.*
   Where, by an arrangement between three, the debt of one to another has been transferred to the third, it is competent for them to make a new arrangement to transfer the debt back to the original debtor; and this may be done as well by an actual and understood abandonment of the first novation as by an explicit second novation; and a note thereafter given by the original debtor on account of such debt, cannot be said to have been without consideration.

*Practice in supreme court.*    On writ of error to review upon exceptions to the finding, a judgment based on a finding of facts and conclusion of law on a trial by the court without a jury, the weight or sufficiency of the evidence will not be considered; the only inquiry is whether there was any evidence tending to prove the facts found.

COMPTON *v.* BLAIR.

*Evidence: Consideration.* The evidence in this case tended to prove a consideration for the note sued upon, and to support the facts found.—CAMPBELL, J., dissenting.

Heard May 15.    Decided July 11.

Error to Monroe Circuit.

*C. I. Walker*, for plaintiff in error.

*Norris & Blair*, for defendant in error.

GRAVES, J.

This suit was brought upon a promissory note, made for eleven thousand five hundred dollars by the plaintiff in error to Judge Casey, and transferred to defendant in error after maturity, and the defense is that it was given without consideration.

The case was tried in the circuit without a jury, and the court allowed recovery. The general question raised here is whether there was evidence before the circuit judge tending to show a consideration, and that question may be said to depend upon the complexion the evidence conduced to give to the status and relations of the parties when the note was made, in regard to the alleged former novation of the debt the note was given for.

It is not questioned but that the debt, which originally arose from Colonel Compton to Judge Casey, as the price of the tubing-line interest, was of a character in itself to support the note. But the position of plaintiff in error is, that such debt, by a mutual and valid arrangement between Colonel Compton, Judge Casey and one Adams, was cast upon Adams, and made to be no longer the debt of Colonel. Compton, and that this state of things continued and was subsisting when the note was subsequently executed and delivered, and hence that there was no indebtedness from Colonel Compton to Judge Casey to serve as consideration.

Without disputing the proposition that a mutual arrangement was indeed made by which Adams, instead of Colonel

Compton, was to respond to Judge Casey for the sale price of the latter's interest in the tubing line, the defendant in error maintains, among other grounds, that this exchange of Adams for Colonel Compton, as debtor to Judge Casey, was seasonably given up or superseded; that the parties were remitted to, or re-instated in, their first position and relations and made subject to their former duties, and that the note was really given in keeping with, and as one of the steps in, this course of events, and for the true and existing debt of the maker. The real point in the case is here developed, and if there was evidence which conduced to support this view, it follows that the finding cannot be disturbed.

Assuming, as is necessary in this attitude of the case, that the agreement for novation was made, the consideration for the tubing-line interest was not thereby annihilated. That remained as perfect as ever. The right of Judge Casey to the money, or rather to compensation, was not taken away. The arrangement for the novation simply changed the debtor and made the price of the tubing-line interest the debt of Adams instead of that of Colonel Compton, and it was as practicable for the parties by agreement to shift the debt back *to* Colonel Compton as it had been to shift it *from* him, and if in fact they regained their original standing and relations, it is quite unimportant whether they did so by an explicit second novation, or by an understood and actual abandonment of the first, and an actual resumption of former rights and duties respecting the debt.

The examination of the point in question involves considerations somewhat different from those which may arise on a motion for a new trial.—*Hall v. Pike, 100 Mass., 495.* When we explore the record for evidence having the claimed tendency, it is not necessary that we should find any thing direct and positive in order to uphold the judgment. It will suffice if the facts and circumstances, with the inferences flowing from them, were conducive to the result.

And we are not to weigh evidence, or judge of its sufficiency, or pass upon the credibility of witnesses. That was the province of the court below, when sitting upon the facts in place of a jury. We have no power to question on this record the action of that court in judging, where witnesses were opposed, that the testimony of one inspired belief, and that of another did not.

Neither are we to inquire whether the finding is such as we should have made. Even if we were to conclude that we should have reached a different opinion upon the facts, that circumstance would not by itself warrant us in overruling the conclusion of the circuit court. And as all know very well, that the 'hearing of evidence as delivered from the stand may make an impression not always to be communicated by a written statement of the words, there is reason for saying that the reported evidence should be construed favorably to sustain the finding.

In the light of these observations, the question recurs, whether there was any evidence for the court to consider, upon the position taken by defendant in error. Was there any evidence, circumstantial or otherwise, tending to show that the three parties to the novation arrangement gave up that arrangement, resumed their original status and relations, and that the note was given on that footing?

The first circumstance most deserving of notice is the explanation given by Colonel Compton himself. The reason he gives for the existence of the note is, that Judge Casey desired it, to preclude the appearance of any connection by him with the cotton claim which was the subject of the arrangement between Adams and Colonel Compton, and that he (Colonel Compton) thereupon made and delivered the note, to be held as a mere memorandum, and simply in order to save appearances.

The note was for the large sum of eleven thousand five hundred dollars, and was complete and formal, and this explanation of the motives for issuing such a note, an instrument by its terms amounting to regular commercial

paper, and subject to be negotiated and circulated in ordinary course as genuine, is not so extremely plausible as to be strongly persuasive. It is not usual for paper to be put afloat in this way, because not in harmony with the dictates of prudence and business rectitude; and whilst the given explanation was in itself by no means incredible, still the mind might naturally feel some hesitation when solicited to accept it. And if there was a tinge of improbability in the only hypothesis offered in opposition to that raised upon the evidence for the defendant in error, it was natural and reasonable that it should influence the mind of the court in its effort to find the true hypothesis. And more especially if, as we think was the case, the counter explanation was found to be exposed to no such criticism.

There seems to have been no substantial disagreement about several of the material circumstances.

When the interest of Judge Casey and others in the tubing line was sold by them to Colonel Compton, the judge was indebted to Adams in from seven to nine thousand dollars, and was to get from Colonel Compton eleven thousand five hundred dollars for his interest in the tubing line. At this time Colonel Compton was pressing a pending cotton claim against the government, and immediately on the purchase of the tubing line he employed Adams to work up his claim against the government, and was to allow him half of the proceeds, and it seems to have been then arranged between Adams, Colonel Compton and Judge Casey, that Adams, on the strength of his expectations from the cotton claim, should, instead of Colonel Compton, stand as debtor to Judge Casey for the price Colonel Compton had agreed to pay the judge for his interest in the tubing line, namely: eleven thousand five hundred dollars, it being understood between Adams and Judge Casey that the debt owing by the latter to Adams should apply as far as it would go.

Some months afterwards, and whether upon sufficient or insufficient grounds is for this case wholly immaterial,

27 MICH.—51.

very unfavorable impressions were produced in some offi-
cial minds as to the validity and good faith of the cotton
claim; and this state of things, it is said, produced a
change in the mind of Adams, and led him to be dissatis-
fied with his arrangement. At about the same time a com-
munication appeared at Washington, which, besides assailing
the claim, attributed some connection with it to Judge
Casey. But Colonel Compton and Judge Casey equally
deny that the judge had any such connection, and we are
not called upon to inquire into the subject.

These circumstances are chiefly noticeable as evincing
causes in operation suited to induce the three parties to the
scheme of novation to undo that arrangement.

There is evidence that Adams complained that the claim
had been misrepresented to him, and that he positively
refused to prosecute it, and there is testimony on both sides
that he was "unable" to go on with it. Colonel Comp-
ton testifies that he saw Adams and that the latter informed
him that he was unable to fulfill his agreement, "but would
make all right." Indeed, the testimony of Colonel Comp-
ton tends to show that Adams in fact failed or refused to
proceed with the prosecution of the claim, and that he him-
self acted more or less in it.

Mr. Coleman, a witness for Colonel Compton, testifies
that Judge Casey sent by him to request Colonel Compton
to call and give his obligation for the price of the tubing
line, and that he communicated the request to Colonel
Compton. Judge Casey testified that he talked with both
Adams and Colonel Compton about the situation; that
Adams refused to carry out the arrangement, and declared
himself not bound by it, and that Colonel Compton said
he did not regard himself as bound; that he (Judge Casey)
then appealed to Colonel Compton and said to him, "if
this agreement between you and Adams is revoked, I am
left without any pay, and you must give me something to
show my interest," and that Colonel Compton agreed that
he would do so, and accordingly did give the note; that

he (Judge Casey) agreed to extend the time of payment, and in compliance therewith endorsed an extension on the note; that afterwards the demands held by Adams against him (Judge Casey), or the most of them, were satisfied; that Colonel Compton subsequently made payments upon the note, and repeatedly promised to pay the whole of it.

We do not attempt to reproduce the evidence in detail, or even to make specific references to all which favors our conclusion. After an attentive examination, we are constrained to think that the evidence to which we have alluded specially, with other facts and circumstances in the record, was in the direct line to prove and tended to prove the restoration of conditions and relations adapted to support the note.

The evidence mentioned, we think, had a tendency to show that the three parties (Adams, Colonel Compton and Judge Casey) secured an interchange of views and thereby came to a common understanding, recognized by each and all, that the novation arrangement was given up. And further, that this understanding, so reached, was followed up by measures on the part of each, inconsistent with the continuance of the novation arrangement, but suited to the duties pertaining to the state of things consequent upon the asserted change; that the evidence in question conduced to show that Adams did not go on with the prosecution of the cotton claim, and that Colonel Compton resumed personal agency about it as though it was again a matter for his personal concern; that Adams refused to pay Judge Casey, and, on the contrary, exacted payment from the judge, and that Colonel Compton personally agreed to pay to Judge Casey the very debt which, by the novation arrangement, was cast upon Adams; and that, in short, the parties resumed their old positions and relations and assumed the corresponding duties.

It was certainly not indispensable that these persons should all meet together face to face, and in express terms agree to abandon their former plan and return to the old

state of things.    It was quite sufficient if their minds met upon the subject and their accord was intelligently acted upon.    And I think there was evidence which, upon an admissible construction, conduced to show such a result.

Of course it is not to be denied that there was evidence favoring the explanation given by the defendant below, but between this and the opposing theory it was for the court below to find where the truth lay.

I think the judgment should be affirmed, with costs.

COOLEY, J., concurred.

CAMPBELL, J.

I am unable to find in the testimony any thing which would tend to show any consideration for the note in suit.

Compton had fully paid for his tubing interest in the first place by transferring to Adams the interest in the cotton claim, and had no further connection ·with, or liability to Casey.    The transactions between Casey and Adams could not thereafter concern Compton at all.

This being so, there could be no consideration for the new note unless Compton received some benefit, or got Casey to give up some existing right in exchange for it, either to himself or to Adams.

The court does not make any finding that the object of the parties was to ·cover up the fact that Casey had been in any way affected by a contract which related to a claim that got into his court, and finds exactly what the consideration was.    The finding is, that the consideration for the new note consisted in Casey's release of Adams from his obligation, and that this was by agreement of all three. This would be a valid consideration.

But I think the testimony in no way tends to support any such finding.    Casey is the only witness in regard to it who can be claimed to maintain it, and I think his evidence will not bear it out by any assertion or inference.

He swears that Adams refused to pay him on the ground

that he found more difficulties in the way of the contract than he had any reason to anticipate. He swears also that Compton had become dissatisfied with the failure of Adams to use diligence, and that he did not feel bound by the agreement between them. But he does not say, or intimate, that there was ever any agreement or understanding between Adams and Compton that the old agreement should be rescinded, nor that this note was based on any such arrangement.

On the contrary, he swears in the most express language that there was no agreement whatever at the time this note was given, except that the time of its payment should be extended. He says that it was given because Adams refused to do as he had originally agreed, and does not even intimate, either that Adams and Compton rescinded their arrangement, or that he himself made any promise to Compton to release Adams, or that Compton desired such release. According to his statement, the note was given by Compton merely because Casey was likely to lose his debt, and for no other reason. This may have been a liberal intention, but it can form no legal consideration for a promise. The extension was no consideration if there was no debt to extend.

The fact that Adams and Compton each claimed that the other had broken his agreement, in no way indicates a mutual rescission, and does not show that either of the parties would have been willing to rescind and release the other without compensation. If the transaction would (as perhaps it might) have been a reasonable one, there is no proof that it was made, or agreed to be made. As Casey states the matter it does not appear that either Casey or Adams did, or promised to do any thing as a consideration to induce Compton to make the note.

I think the judgment should be reversed.

CHRISTIANCY, CH. J., did not sit in this case.